UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RUSSELL MANLEY,

                        Plaintiff,

      -v-

WILLIAM M. MAZZUCA, Superintendent;
THOMAS G. EAGEN, Director I.G.P.; JOHN/JANE
DOE, C.P.S.; JOHN/JANE DOE, Div. of Health
Svcs.; JOHN & JANE DOE'S, I.G.P. C.O.R.C.; in
their Individual and Official Capacities,

                        Defendants.

Case No. 01-CV-5178 (KMK)

OPINION AND ORDER

Appearances:

Constance Elaine Arabatzis, Esq.
Aaron Ramon Pam, Esq.
Deborah Skakel, Esq.
Dickstein, Shapiro, Morin & Oshinsky, LLP
New York, New York
*Counsel for Plaintiff*

John E. Knudsen, Esq.
Office of the Attorney General of the State of New York
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Russell Manley, a prisoner, alleges that Defendants William Mazzuca, Thomas

Eagen, and numerous unidentified officers working in the New York State Department of

Correctional Services' Inmate Grievance Program and Division of Health Services failed to

provide him with adequate treatment for a laceration on his right hand.  Specifically, Plaintiff

claims that Defendants violated his civil rights by being deliberately indifferent to his serious

medical needs and grossly negligent in their treatment of his wounds.  Plaintiff brings this

lawsuit for damages pursuant to 42 U.S.C. § 1983, alleging violations of the Eighth and

Fourteenth Amendments to the United States Constitution.

Defendants have moved for summary judgment on the grounds that:  (1) Plaintiff's injury

was not sufficiently serious to violate his constitutional rights; (2) Plaintiff has failed to show

that Defendants had the requisite state of mind to establish a violation of the Eighth Amendment;

(3) Defendants were not personally involved in any constitutional violation; (4) Defendants are

entitled to qualified immunity; and (5) Plaintiff's claims against Defendants in their Official

capacities are barred by the Eleventh Amendment.  For the reasons discussed below, the motion

is GRANTED.

## I.  Background

At all times relevant to this Opinion, Plaintiff was an inmate in the custody of the New

York State Department of Correctional Services ("DOCS"), housed at the Fishkill Correctional

Facility in Beacon, New York ("Fishkill").  (Defs.' Statement Pursuant to Local Rule 56.1 ¶ 1

("Defs.' 56.1").)  Plaintiff suffers from arthritis in his hands, feet, and hip, which limits his

dexterity and results in chronic, extreme pain.  (Decl. of John Knudsen Ex. D at 37:22-38:17

("Pl.'s Dep.").)  On June 29, 1999, Plaintiff suffered cuts on his right thumb and left palm while

he was attempting to bend the lid of a tuna fish can into a shape suitable for slicing an onion.

(Defs.' 56.1 ¶ 4.)  The cut on Plaintiff's thumb was deep, and he was immediately escorted to

Fishkill's medical department.  (*Id.* ¶ 5.)

Plaintiff was first treated by a nurse, who cleaned the wound, applied anti-bacterial

medication, and contacted the on-call Physician's Assistant.  (*Id.* ¶ 7.)  The nurse noted that

Plaintiff had suffered a one-inch long cut encircling the distal portion of his right thumb and that

Plaintiff complained of a loss of sensation in that digit.  (*Id.* ¶ 6.)  The Physician's Assistant closed the wound with seven stitches, and prescribed Tylenol for Plaintiff's pain.  (*Id.* ¶ 8.)  Plaintiff returned to the medical department for additional treatment on a number of occasions over the next few weeks, including the removal of his stitches.  (*Id.* ¶ 9; Pl.'s Statement of Material Facts Pursuant to Local Rule 56.1(b) ¶ 9 ("Pl.'s 56.1").)

On August 18, 1999, Plaintiff returned to the medical department, complaining of swelling, a decrease in flexibility and grip strength, and persistent numbness in his right thumb. (Defs.' 56.1 ¶ 10.)  Based on his observations of Plaintiff's condition, the treating physician submitted a request for an outside consultation, requesting that a physical therapist evaluate Plaintiff's condition and advise the DOCS medical staff.  (*Id.* ¶ 11.)  The physical therapist performed a number of tests on Plaintiff's hand and directed him to perform a series of exercises to increase his grip strength and dexterity.  (*Id.* ¶¶ 12-14.)  She also asked that DOCS medical personnel re-evaluate Plaintiff's right hand for hypersensitivity.  (Pl.'s 56.1 ¶ 12.)

Plaintiff returned to the medical department on February 18, 2000.  The attending physician, noting that Plaintiff's complaints of pain and loss of flexibility persisted, requested outside consultation with an orthopedic hand specialist.  (Defs.' 56.1 ¶ 16.)  The DOCS request form for outside consultation has a boxed-off area in the upper-right corner labeled "Coordinated Care Information."  (Decl. of John Knudsen Ex. C at Manley 535.[1])  That box contains a number of blanks where the doctor filling out the request can indicate the type of care requested.  One of the blanks is titled "Consultation Type" and is followed by four choices:  Initial, Follow up,

_____

[1]Many of the exhibits submitted by the parties are labeled with numbers that include Plaintiff's name.  The Court has adopted this method of citation, as it is the only way to refer to specific pages within exhibits that number hundreds of pages.

Procedure, and Telemed.  (*Id.*)  None of these choices was marked on the initial referral form.

The physician wrote that the reason for the request was Plaintiff's continued post-physical

therapy pain and stated, "Please evaluate and advise."  (*Id.*)

  In response to this request, Plaintiff was sent to St. Agnes Hospital on March 10, 2000,

for a consultation with Dr. Richard Magill ("Dr. Magill"), an orthopedist who specialized in

hands.  (Defs.' 56.1 ¶ 17.)  Dr. Magill noted, in virtually indecipherable script, that Plaintiff

continued to experience pain and loss of sensation, and wrote "[illegible] exploration of nerve

repair or relocation of [illegible]."  (Pl.'s 56.1 ¶ 17; Decl. of John Knudsen Ex. C at Manley 532.)

Fishkill's computerized records of this visit also contain the following post-consultation

notation:  "Can not read consult recommendations."  (Aff. of Russell Manley Ex. D at Manley

Referral 9 ("Manley Referral").)  Plaintiff, however, claims to have deciphered the script.  He

argues that Dr. Magill's notations include nine separate "observations," including "a surgical

exploration of [Plaintiff's] damaged and/or severed nerve and/or neuroma, if any, was indicated,

and . . . such an orthopedic surgical procedure should be scheduled and performed."  (Pl.'s Mem.

of Law in Opp'n to Defs.' Mot. for Summ. J.  5 ("Pl.'s Opp'n Mem.").)

  On March 16, 2000, Dr. Francis, the attending physician at Fishkill, again filled out a

request for outside consultation regarding Plaintiff's hand.  This request mirrored the first one,

except that the doctor selected "Follow up" as the Consultation Type and, instead of asking for

an evaluation, wrote "RTC per your request for reevaluation."  (Decl. of John Knudsen Ex. C at

Manley 532.)  This request was denied by Correctional Physician Services ("CPS"), a vendor

contracted by DOCS to review requests for specialty medical care.  (Decl. of John Knudsen Ex.

H at 55 ("Lang Dep."); Manley Referral 7.)  Fishkill's computerized record of this request

included a comment on the denial which reads, "Why is another follow up being requested?"
(Manley Referral 7.)  The denial was reviewed by Dr. Alexis Lang ("Lang" or "Dr. Lang"), the
DOCS regional medical director, and was upheld on May 3, 2000.  (Defs.' 56.1 ¶¶ 22-24.)  No
additional requests for outside consultation were made.  (*Id.* ¶ 26.)

On December 20, 2000, Plaintiff wrote to Fishkill's Inmate Grievance Resolution
Committee ("IGRC"), describing his injury and stating that the hand specialist had recommended
surgery to restore movement to his right thumb.  (Defs.' 56.1 ¶ 29; Aff. of Russell Manley Ex. D
at Manley Grievance 3 ("Manley Grievance").)  He requested that he receive "proper diagnosis
and treatment."  (Defs.' 56.1 ¶ 29; Manley Grievance 3.)  Lewis Goidel ("Goidel"), supervisor of
Fishkill's Inmate Grievance Program ("IGP"), conducted an investigation into Plaintiff's
grievance.  (Defs.' 56.1 ¶ 30.)  He advised Plaintiff that he could appeal the denial of the
consultation recommendation to Dr. Lang.  (*Id.* ¶ 31.)  Goidel also told Plaintiff to advise him if
he intended to pursue a formal grievance.  (*Id.*)  Plaintiff informed Goidel that he was interested
in pursuing a formal grievance so he could seek relief in court.  (*Id.* ¶ 32.)

On January 2, 2001, Goidel formally processed Plaintiff's grievance.  (Pl.'s 56.1 ¶ 33.)
On January 4, 2001, Plaintiff's grievance was heard before the IGRC.  (*Id.*)  The IGRC came to
the same conclusion as Goidel, recommending an appeal to Dr. Lang of the consultation denial.
(Defs.' 56.1 ¶ 34.)  Plaintiff immediately appealed the decision of the IGRC to the then-
Superintendent of Fishkill, Defendant William Mazzuca ("Mazzuca").  (*Id.* ¶ 35.)  One day later,
on January 5, 2001, Mazzuca reviewed Plaintiff's appeal and stated that he concurred with the
IGRC's recommendation.  (*Id.* ¶ 36.)

On January 11, 2001, Plaintiff appealed Superintendent Mazzuca's decision to the DOCS

5

Central Office Review Committee ("CORC"), DOCS' highest level of administrative review. (*Id.* ¶ 37.)  After investigation, CORC upheld Mazzuca's determination on January 31, 2002, in a written decision signed by Defendant Thomas Eagen ("Eagen"), head of the statewide Inmate Grievance Program.  (*Id.* ¶¶ 38-39.)  The written decision stated, incorrectly: "The grievant has been at sick call for complaints regarding pains in his left hand.  However, there is no record that the grievant has made any complaints regarding pain in his right hand."  (Manley Grievance 1.)

On March 21, 2001, Plaintiff sent a letter to Dr. Lang requesting medical treatment for his thumb.  (Compl. Ex. 6.)  Dr. Lang claims never to have received this letter (Defs.' 56.1 ¶ 42), but there is no dispute that Dr. Lang never followed up on Plaintiff's medical treatment.

## II.  Discussion

### A.  Standard of Review

To prevail on a motion for summary judgment, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" must show that there is no "genuine issue" as to any material fact.  Fed. R. Civ. P. 56(c).  The burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  All inferences must be drawn in favor of the non-moving party.  *See id.* at 69-70.  To avoid summary judgment, however, the non-moving party must offer "some hard evidence" of its version of the facts, not merely rely on conclusory allegations or speculation.  *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998); *see also McPherson v. N. Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] must do more than show there is some

6

metaphysical doubt as to the material facts" (internal quotations and citations omitted)).  Only

when no rational jury could find in favor of the non-moving party should a court grant summary

judgment.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001).

The materiality of the facts considered is governed by the substantive law.  *See Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *D'Amico*, 132 F.3d at 149.  When considering a

summary judgment motion, courts are not charged with weighing the evidence and determining

its truth; instead, courts must determine whether there is a genuine issue for trial.  *See Castro v.
Met. Transp. Auth.*, No. 04 Civ. 1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006);

*Westinghouse Elec. Corp. v. N. Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990).

The goal of this inquiry should be to "isolate and dispose of factually insupportable claims."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

B.  Eighth Amendment Violation

1.  Legal Standard

To state a section 1983 claim, a plaintiff must allege a violation of his constitutional or

statutory rights by a person acting under the color of state law.  *See* 42 U.S.C. § 1983; *West v.
Atkins*, 487 U.S. 42, 48 (1988).  The Eighth Amendment, which applies to states under the Due

Process Clause of the Fourteenth Amendment, guarantees freedom from cruel and unusual

punishment.  The Eighth Amendment "imposes a duty on prison officials to ensure that inmates

receive adequate medical care."  *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  In *Salahuddin*, the Second Circuit explained in

great detail the two conditions that must be met to show that a prison official has violated this

duty.  *Id.*

7

First, the deprivation of care must be "sufficiently serious." *Id.*; *see also Farmer*, 511 U.S. at 825. This requirement is objective, and is analyzed using a two-part inquiry. Initially, the Court must determine whether the inmate was actually denied adequate care. *See Salahuddin*, 467 F.3d at 279-80. Prison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is "reasonable." *Id.* at 280 (citing *Farmer*, 511 U.S. at 844-47). Second, if the care provided was unreasonable, courts must inquire as to whether that inadequacy was "sufficiently serious." *Id.*; *see also Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Salahuddin*, 467 F.3d at 280 (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). This analysis requires an examination both of the harm already caused to the prisoner and the likelihood that harm will continue or increase without additional treatment. *See id.*; *see also Smith*, 316 F.3d at 185. Thus, the "seriousness" inquiry will vary based on the nature of the treatment provided and the claim asserted by the inmate. *See Salahuddin*, 467 F.3d at 280.

The second condition is subjective, and requires that the prison official involved act with a "sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). This is satisfied by a showing that the official acted with "deliberate indifference" toward Plaintiff's health, a state of mind akin to criminal recklessness.[2] *Id.*; *see also Farmer*, 511 U.S.

---

[2]Plaintiff's third claim alleges "gross negligence" on the part of Defendants. A handful of courts, prior to the Supreme Court's decision in *Farmer*, held that a finding of gross negligence is sufficient to state a claim under the Eighth Amendment. *See, e.g.*, *Gibralter v. City of New*

at 839-40.  "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."  *Salahuddin*, 467 F.3d at 280.

2.  Application

Defendants argue that Plaintiff has failed to raise a material question of fact as to either requirement needed to make out an Eighth Amendment claim based on inadequate medical care. They contend that, as a matter of law, Plaintiff's injury was insufficiently serious to establish a violation of the Eighth Amendment and, in the alternative, that Plaintiff has failed to show that the Defendants acted with the requisite intent.

a.  Objective Requirement

The first required inquiry is whether Plaintiff received adequate care.  Disputes over the proper course of treatment are not actionable under the Eighth Amendment.  *See Brown v. DeFrank*, No. 06 Civ. 2235, 2006 WL 3313821, at *20 (S.D.N.Y. Nov. 15, 2006).  So long as prison officials act "reasonably," no violation of the Eighth Amendment occurs.  *See Salahuddin*, 467 F.3d at 280.  The evidence in the record, however, is not so clear.  It is undisputed that Plaintiff received some treatment for his injury.  He received stitches, physical therapy, and continuing medication for his pain.  Plaintiff's primary symptoms were treated.  Thus, to prevail on his Eighth Amendment claim, Plaintiff must show that Defendants' refusal to order additional treatment, namely surgery, was unreasonable in light of the evidence available to them.  As a matter of law, he has failed to do so.

_____

*York*, 612 F. Supp. 125, 133 (S.D.N.Y. 1985).  In *Farmer*, however, the Supreme Court explicitly stated that the required state of mind for a case in which a prisoner asserts a violation of the Eighth Amendment is "deliberate indifference."  *Farmer*, 511 U.S. at 834.  Thus, if Plaintiff fails to show that Defendants were deliberately indifferent, he cannot succeed on a theory of gross negligence.

9

Plaintiff alleges that his failure to receive surgery, despite his repeated requests, is sufficient evidence to raise an issue of material fact as to whether his care was adequate. Plaintiff, however, has produced no evidence that any Defendant was aware that surgery on his hand was necessary or even recommended.  Plaintiff has not sued the prison doctors who treated him, rather, he has sued those who reviewed his grievance.  The only evidence that surgery on Plaintiff's hand was merited was an illegible note from a single doctor, the computer record of which simply stated that it was impossible to read.  (Decl. of John Knudsen Ex. C at Manley 535; Manley Referral 9.)  A report prepared by Defendants' expert who examined Plaintiff five years later stated that injuries like those sustained by Plaintiff did not require surgery.  The expert also stated that the treatment Plaintiff received, physical therapy and pain medication, was an adequate course of treatment.  (Decl. of John Knudsen Ex. B at 3 ("Roth Report").)  In addition, Defendants did not summarily deny Plaintiff care.  They simply recommended he appeal the denial of the second referral request to the regional medical director, Dr. Lang.  Plaintiff disagreed with this course of action, and filed a grievance.  That disagreement, however, is not actionable under the Eighth Amendment.  *See Joyner v. Greiner*, 195 F. Supp. 2d 500, 505 (S.D.N.Y. 2002) (holding that failure to provide inmate with requested MRI was not actionable); *Davidson v. Scully*, 155 F. Supp. 2d 77, 85-86 (S.D.N.Y. 2001) (holding that when inmate was provided with some types of treatment, but not others, care was adequate); *Culp v. Koenigsmann*, No 99 Civ. 9557, 2000 WL 995495, at * 7 (S.D.N.Y. July 19, 2000) (noting that disputes over quality of treatment are not actionable).

Assuming, *arguendo*, that Plaintiff's care was not adequate, the second inquiry is whether Plaintiff's injuries are sufficiently serious.  An injury is sufficiently serious when it poses a

"condition of urgency," such as "one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  In a case such as this one, where Plaintiff was not denied all treatment for his injury, the seriousness inquiry focuses on the denied treatment, not merely Plaintiff's condition.  *See Salahuddin*, 467 F.3d at 280; *Smith*, 316 F.3d at 186 ("[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes.").  In this case, then, summary judgment must be granted unless Plaintiff can show that there is a question of material fact as to whether the denial of surgery significantly affected Plaintiff's daily life activities or caused him chronic pain.  *See Salahuddin*, 467 F.3d at 280; *Smith*, 316 F.3d at 185-86; *Chance*, 143 F.3d at 702.

There is no evidence that the denial of surgery on Plaintiff's hand has significantly affected Plaintiff's daily life activities.  Plaintiff certainly continues to be effected by the cut to his hand, and the Court does not make light of Plaintiff's injury.  Plaintiff complains of persistent numbness in his thumb and limited flexibility in his hand.  Although, while in prison, Plaintiff engaged in many of the same activities as he did prior to the injury, e.g. exercise, work, and legal preparation (Pl.'s Dep. 20:3-27:9), Plaintiff has since been released.  As discussed at oral argument, Plaintiff is now working and taking care of himself, and his daily activities differ greatly from when he was incarcerated.  Plaintiff's counsel stated that he has difficultly working and preparing food for himself due to his inability to properly grip utensils in his right hand, which is his dominant hand.  Although Plaintiff is able to manage, the numbness he experiences makes life more difficult.

11

While Plaintiff has produced evidence that his daily life activities have been affected by his injury, he has not produced any evidence that the denied treatment, surgery, would have improved it.  Plaintiff speculates that, because Dr. Magill allegedly recommended surgery, surgery might have improved his mobility and have alleviated the chronic numbness he experiences.  The only medical testimony in the record, however, says otherwise.  Dr. Roth, Defendants' expert, stated in his report that the numbness in Plaintiff's hand may be related to issues with his spine, not any nerve damage, and also stated that surgery "would not be contemplated for nerve lacerations in this location."  (Roth Report 3.)  He also stated unequivocally that "[s]urgery was never indicated in this case."  (*Id.*)  Tests performed by Dr. Roth show that Plaintiff has a normal range of flexibility and movement in his right thumb.  (*Id.* at 2-3.)  Plaintiff has produced no evidence that the denial of surgery, rather than merely his underlying medical condition, has affected his daily life activities.  *See Smith*, 316 F.3d at 186.

The next factor to consider is whether the failure to provide Plaintiff with surgery for his hand has caused him chronic pain.  This inquiry is made difficult by the fact that Plaintiff, prior to his injury, suffered chronic pain in his left hand due to severe arthritis.  (Pl.'s Dep. 37:22-38:17.)  There is no doubt that Plaintiff has felt pain in his hand.  His repeated post-trauma visits to the medical department at Fishkill confirm that fact.  Pain alone, however, is not sufficient to establish an Eighth Amendment violation, as courts in the Second Circuit have found no violation of the Eighth Amendment in spite of pain from broken limbs, cuts, and chronic arthritis.  *See Rodriguez v. Mercado*, No. 00 Civ. 8588, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (report and recommendation) (listing cases); *see also Hanson v. Kaplan*, No. 02-C-938, 2005 WL 2209419, at *4-6 (E.D. Wis. Sept. 12, 2005) (granting summary judgment in favor

of defendant where plaintiff claimed that treating doctor's failure to follow recommendations of an outside consultant led to nerve damage and numbness in his leg); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (holding that cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't*, No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (holding that inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation).

Plaintiff relies primarily on two cases to support the contention that the numbness he experiences in his hand is actionable.  First, in *Brock v. Wright*, 315 F.3d 158 (2d Cir. 2003), the Second Circuit reversed a grant of summary judgment in favor of defendants who had refused to authorize surgery on the plaintiff's painful keloids.  The court held, "[w]e do not . . . require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear." *Id.* at 163.  Less serious denials of care which "perpetuate pain" are also actionable. *Id.* The *Brock* case, however, is distinguishable from the present action for several reasons.  First, the plaintiff in *Brock* had alleged that his pain significantly affected his daily life activities.  For example, the plaintiff alleged that whenever he moved his mouth, brushed his teeth, ate, or even smiled, it felt as though the right side of his face was "being stuck with needles." *Id*. at 161. Here, the undisputed evidence is that Plaintiff's daily life activities are not affected by his pain; they are affected by numbness.[3]  Second, in *Brock* the plaintiff had been denied any treatment for his pain. *Id.* Here, Plaintiff, due to the chronic pain from his arthritis, is regularly prescribed a series of pain killers.  (Pl.'s Dep. 14:11-16:5.)  Third, in *Brock* the plaintiff's pain was directly

---

[3]As noted above, Plaintiff has shown he is affected in his daily life activities due to the numbness he experiences and, potentially, his loss of gripping ability.  That is distinct from *Brock*, however, where the issue was *pain*.

13

attributable to his lack of surgery.  Here, Plaintiff is uncertain whether his pain is a result of his

injury or his chronic arthritis.  (*Id.* at 33:8-11.)  Finally, in *Brock*, the only medical evidence

submitted at the summary judgment stage was an affidavit from a doctor that supported the

plaintiff's request for additional treatment.  Here, the only medical evidence submitted is the

testimony and report of Defendants' expert who concluded that the surgery Plaintiff requested is

unnecessary.  (Roth Report 3.)  Dr. Roth also stated that Plaintiff's symptoms may persist even

after surgery.  (Aff. of Russell Manley Ex. L at 119:1-121:22 ("Roth Dep.").)

Plaintiff also relies on *Hernandez v. Keane*, No. 97 Civ. 1267, 2000 WL 34239139

(S.D.N.Y. Nov. 28, 2000).  In that case, the court held that a reasonable jury could find that a

prisoner was experiencing extreme pain due to bullet fragments that remained in his hand and

wrist, the removal of which had been delayed by prison officials.  *Id.* at *4.  Here, however, there

is insufficient evidence to establish that any of the pain Plaintiff experienced is directly

attributable to his lack of surgery.  Plaintiff is unable to distinguish between the pain from his

injury and the chronic pain he experiences on a daily basis from his arthritis.  (Pl.'s Dep. 33:8-

11).  In addition, as discussed above, Plaintiff has produced no evidence that the surgery would

in fact alleviate, or even reduce, his pain.[4]  Thus, although the Court must draw all inferences in

favor of Plaintiff, the evidence in this case is insufficient to raise an inference that Defendants

perpetuated Plaintiff's pain by failing to send him back to the specialist for surgery.  *See Thomas*

*v. Nassau County Corr. Ctr.*, 288 F. Supp. 2d 333, 338 (E.D.N.Y. 2003) (holding that subjective

---

[4]Although Plaintiff alleges that Dr. Magill's note requests surgery, there is no evidence in
the record that the surgery would necessarily have been successful.  The only evidence in the
record on the likelihood of success from the surgery is from Dr. Roth, who indicated in his
deposition testimony that there was no guarantee that surgery would alleviate, or even reduce,
Plaintiff's symptoms.  (Roth Dep. 71:3-74:15, 119:1-21:22.)

complaints of pain from hand injury insufficient to meet Eighth Amendment standards); *Veloz v. New York*, 35 F. Supp. 2d 305, 312 (S.D.N.Y. 1999) (holding that foot pain was insufficiently serious to raise Eighth Amendment violation).

### b.  Subjective Requirement

Even if Plaintiff's condition was "sufficiently serious" to constitute a deprivation of his Eighth Amendment rights, Plaintiff has not shown that Defendants acted with sufficient intent to violate the Constitution.  The Second Circuit described the required state of mind in *Salahuddin*:

> Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law.  This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable.  The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result.  Rather, proof of awareness of a substantial risk of the harm suffices.  But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

467 F.3d at 280 (internal quotations and citations omitted); *see also Farmer*, 511 U.S. at 839-40.

Here, Plaintiff has no evidence that any Defendant was aware of any substantial risk of harm to Plaintiff.  Plaintiff has not sued the prison doctors who administered his care and made his treatment decisions.  Rather, he has sued some supervisory officials who denied his grievance objecting to the denial of the second referral to outside doctors, based on the administrative record prepared by prison grievance personnel.  Plaintiff claims that Defendants knew that he required surgery because (1) it was prescribed by the consulting doctor (Pl.'s Opp'n Mem. 19), and (2) Plaintiff's grievance stated that his doctor prescribed surgery, thus making them aware of

the recommendation (*id.* at 20).  Plaintiff relies on *Johnson v. Wright*, 234 F. Supp. 2d 352 (S.D.N.Y. 2002), for the proposition that this evidence is sufficient to survive summary judgment.  In that case, the court held that a plaintiff's allegation that prison officials willfully ignored the recommendations of his doctors constituted deliberate indifference to his medical needs.  *Id.* at 361.

Plaintiff's reliance on *Johnson* is misplaced, however, as the evidence in this case is not conclusive that Plaintiff's desired surgery was actually prescribed.  *Johnson* involved a motion to dismiss, and the court in that case merely considered whether the plaintiff's allegations were sufficient to state a claim.[5]  *Id.* at 355.  In this case, the only evidence that surgery was called for derives from nearly illegible notes from Dr. Magill, the consulting specialist.  It is not clear from the face of these notes that this physician actually stated surgery was necessary or even scheduled a return visit.  (Decl. of John Knudsen Ex. C at Manley 535.)  The legible portion of these notes is sparse at best, and only indicated something about "exploration of nerve repair or relocation" of something.  Indeed, even if Plaintiff claims that he now can decipher the notes, CPS recorded in the computerized records of Plaintiff's visit that the notes were illegible.  In addition, there is no evidence that it was the consensus of Plaintiff's doctors that Plaintiff should have surgery.  The initial doctor who examined Plaintiff at Fishkill merely referred Plaintiff for physical therapy.  This treatment appears to have worked (Roth Report 4), as Plaintiff's range of motion

---

[5]Plaintiff, on numerous occasions, argues that the Court should deny summary judgment because of Judge Jones's denial of Defendants' motion to dismiss.  To the extent Plaintiff is arguing that denial of a motion to dismiss requires denial of summary judgment, the law lends him no support.  *See Chance*, 143 F.3d at 701 (noting difference between motion to dismiss standard of review and summary judgment standard); *see also Salahuddin*, 467 F.3d at 282 (noting different evidentiary requirements for summary judgment motion and dismissing claim where record did not show an issue of material fact).

and grip strength have returned (*id.* at 2-3).  There is also no evidence that any other doctor referred Plaintiff to an outside physician for continued pain in his hand, or acted on the allegedly clear recommendations of the consulting physician.  (Manley Grievance 4.)  As stated in the initial referral, the purpose of sending Plaintiff to St. Agnes was for advice.  (Decl. of John Knudsen Ex. C at Manley 535.)  The recommendation for a follow up was for a re-evaluation; there is no mention of surgery.  (*Id.* at Manley 532.)  In addition, Defendants' expert, an orthopedic hand specialist, stated that at no point was surgery required for Plaintiff's hand.  (Roth Rep. 3.)  Thus, there is insufficient evidence to support an inference that prison officials were even split as to whether surgery was a necessary treatment for Plaintiff's condition.

Even assuming that surgery was both necessary and prescribed, there is no evidence that Defendants were able to decipher the consulting physicians notes, or that any Defendants were aware of any risk to Plaintiff that would come from a failure to perform surgery.  First, there is no evidence that Plaintiff continued to complain of his injury to medical personnel, or that prison medical personnel prescribed surgery for Plaintiff's hand after CPS recommended denial of the follow-up consult.  Indeed, records of Plaintiff's later visits to the medical center do not show complaints regarding his thumb.  (Manley Grievance 4.)  Thus, there is no evidence that Defendants, who were reviewing the administrative record of Plaintiff's grievance, ever knew, other than from Plaintiff's own word, about a recommendation from *any* doctor for surgery on Plaintiff's hand.  Indeed, the record is barren of any legible recording that surgery was required, let alone contemplated. Moreover, the recommendations themselves do not describe any risk to Plaintiff if he does not receive treatment.  The consulting doctor's opinion for treatment was just that, an opinion.  To be liable for deliberate indifference, however, Defendants must be aware of

the risks to Plaintiff from a denial of treatment.  *See Salahuddin*, 467 F.3d at 282 ("[T]here is no

record evidence that any physician ever informed [Defendant] that it would be harmful to [deny

the requested treatment]."); *Trammell v. Keane*, 338 F.3d 155, 164 (2d Cir. 2003) (finding there

was no awareness of excessive risk when plaintiff received regular treatment for complaints);

*Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) ("[T]he official must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference." (quoting *Hathaway*, 99 F.3d at 553)); *Brown v. DeFrank*, No.

06 Civ. 2355, 2006 WL 3313821, at *19 (S.D.N.Y. Nov. 18, 2006) (quoting *Hemmings*, 134

F.3d at 108).  Finally, it bears repeating that Defendants did not refuse Plaintiff's request for

surgery.  Instead, they resolved Plaintiff's grievance by recommending that he appeal the denial

of the outside consult to Dr. Lang.  That Dr. Lang never received or acted on Plaintiff's

subsequent letter does not make the named Defendants' conduct reckless.

Plaintiff argues that "the gravamen of this action" is that after "becoming aware of

plaintiff's medical condition . . . and the diagnosis made by Dr. Magill . . . defendants took no

action to properly investigate or adequately resolve the purely bureaucratic denial of the

orthopedic surgical recommendation."  (Pl.'s Opp'n Mem. 20.)  However, in *Salahuddin*, the

Second Circuit specifically rejected the idea that a failure to investigate could constitute

deliberate indifference.  The court stated:

> [W]e find unpersuasive [plaintiff's] point that [defendant] did not
> take any steps to investigate the medical propriety [of the decision
> to deny treatment]. . . [Deliberate indifference] would require that
> someone have aroused [defendant's] suspicion that postponing
> [treatment] would be seriously harmful.  While willful blindness to
> a risk might suggest awareness of the risk, simple blindness does
> not, and leads only to a finding of unactionable negligence.

18

467 F.3d at 282.  The same is true here.  At best, Defendants were simply aware that a consulting

doctor had recommended surgery.  However, DOCS doctors had not prescribed that course.

Therefore, the recommendation of an outside consultant is insufficient to show that Defendants,

who were not doctors, were aware that this was a required course of treatment or that failure to

adopt this course of treatment would result in serious harm to Plaintiff.

As Plaintiff's failure to receive surgery is not sufficiently serious to constitute a

deprivation of his Eighth Amendment rights, and he cannot show that any Defendants were

deliberately indifferent to his medical needs, summary judgment in favor of Defendants is

granted.  *See Bonner*, 2000 WL 1171150, at *5.

C.  Personal Involvement,

To be liable for a violation of an inmate's constitutional rights under section 1983, a

defendant must have been personally involved in the alleged violation.  *See Wright v. Smith*, 21

F.3d 496, 501 (2d Cir. 1994); *Tolliver v. Wilson*, No. 99 Civ. 9555, 2000 WL 1154311, at *5

(S.D.N.Y. Aug. 14, 2000).  Personal involvement, in this context, means "direct participation, or

failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under

which unconstitutional practices occurred, or gross negligence in managing subordinates."  *Black*

*v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).  Plaintiff argues that Defendants' failure to properly

investigate his grievance, and therefore their failure to overturn the "administrative denial" of

Plaintiff's surgery referral, constitute personal involvement in the denial of treatment.

However, affirming the administrative denial of a prison inmate's grievance by a high-

level official is insufficient to establish personal involvement under section 1983.  *See Foreman*

*v. Goord*, No. 02 Civ. 7089, 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that

[the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement."); *Joyner*, 195 F. Supp. 2d at 506 ("[I]t is not alleged that [the superintendent] is a doctor, or that he personally provided (or was capable of providing) plaintiff with medical care.  Rather, it is alleged that he affirmed denial of a grievance against the two doctors for failing to provide care. But a prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been 'personally involved' if he does so."); *Thompson v. New York*, No. 99 Civ. 9875, 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001) ("[T]he Superintendent's adoption of the recommendation by the investigating officer cannot by itself demonstrate that he failed to remedy known misconduct.  Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent." (internal citations omitted)).

Plaintiff attempts to distinguish these cases by arguing that Defendants Mazzuca and Eagen were personally involved because they failed to adequately investigate Plaintiff's grievance.  They argue that none of the defendants in the above-cited cases were similarly culpable, because the courts in *Foreman*, *Joyner*, and *Thompson* found that the plaintiffs' underlying claims were frivolous.  However, the rationale outlined by the *Thompson* and *Joyner* courts is not limited to those cases where a court has determined that a plaintiff's complaint is groundless.  Those courts held that high-level prison supervisors, or grievance review board supervisors, should be allowed to rely on the decisions of prison medical staff.  Those decisions are compiled in the administrative record.  As extensively discussed above, there was nothing in

20

the administrative record that merited any conclusion other than what was drawn here.  Plaintiff

was directed to appeal the denial of the follow-up visit to the regional medical director.  In

addition, as discussed in *Thompson*, to hold otherwise would make a high-level prison supervisor

personally liable for a constitutional violation whenever that violation was not resolved correctly

through the grievance process.  Such a holding would virtually eliminate the personal

involvement requirement, as every prison supervisor high up the chain of command would be

personally liable for every prison grievance, as every grievance is appealable to the prison

superintendent and the IGP.  Finally, Plaintiff's attempt to distinguish those cases is untenable.  If

prison supervisors have a duty to re-investigate the decisions of their subordinates, that duty is

not limited to those cases where the underlying claim has merit.  Such a rule puts the cart before

the horse, however, as an additional investigation would always be required to determine the

underlying merit of a grievant's claim.

There were obvious flaws in the investigation of Plaintiff's grievance. Notably, the final

decision stated that Plaintiff had never complained of pain in his right hand, which was obviously

false. Plaintiff has cited no authority, however, and the Court is aware of none, that supports a

conclusion that prison supervisors are liable for constitutional violations merely because they

affirm the conclusions of grievance review boards. Therefore, Plaintiff's claims against

Defendants Mazzuca and Eagen must be dismissed for lack of personal involvement.[6]

### III. Conclusion

Defendants' Motion for Summary Judgment is GRANTED.

SO ORDERED.

Dated:      January *11*, 2007
            New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[6]The Parties also have two additional disputes that the Court need not resolve. First,
Defendants contend that they have qualified immunity. Government officials are protected from
suits against them in their individual capacities where their conduct does not violate any clearly
established rights of which a reasonable person would have known. *See Saucier v. Katz*, 533
U.S. 194, 199 (2001). However, since the Court has found there was no underlying violation of
the Plaintiff's constitutional rights, there is no need to reach the qualified immunity issue. *See id.*
at 201; *Zimmerman v. Macomber*, No. 95 Civ. 0882, 2001 WL 946383, at *8 (S.D.N.Y. Aug. 21,
2001).

In addition, the Parties dispute whether the Eleventh Amendment bars Plaintiff's claims
against Defendants in their official capacities. Plaintiff argues that he is seeking money damages
from Defendants when acting in their individual capacities, but that he is also seeking injunctive
relief against them in their official capacities. Defendants did not reply to these arguments in
their Reply Brief. Regardless, the Court need not reach the Eleventh Amendment issue, as the
numerous other grounds discussed *supra* are sufficient to grant summary judgment. *See*
*Zimmerman*, 2001 WL 946383, at *8.

22